FRANCESCA APRILE *vs.* THE COLONIAL TRUST COMPANY.

ROSE RUBINO *vs.* THE COLONIAL TRUST COMPANY.

MALTBIE, C. J., HAINES, HINMAN, BANKS and AVERY, Js.

Argued April 4th—decided June 14th, 1934.

*Francis P. Guilfoile,* with whom, on the brief, were *James M. Lynch* and *Joseph C. Guilfoile,* for the appellants (plaintiffs).

*Maurice T. Healey, Jr.,* with whom was *William H. Tribou,* and, on the brief, *William J. Larkin, Jr.,* for the appellee (defendant).

HAINES, J. The defendant was the owner in possession of a three-story tenement house in Waterbury in which there were six apartments—two on each floor.

A verandah covered the entire north side of the building and the roof of the building was extended about ten feet to cover it. In the center of this verandah a stairway extended from the ground upward to each floor in succession, and a doorway opened through a partition onto the verandah which was intended for each apartment.

John Rubino was the lessee of the second-floor apartment on the west side of the building, which included five rooms, an inner hallway and the rear verandah thereof. The plaintiffs were the guests of Mr. and Mrs. Rubino, and were seated on this verandah in the early evening of May 28th, 1933, when it collapsed without warning, throwing them to the floor below and causing the injuries complained of.

The northwest corner of the verandah was supported by a wooden post, six by six inches in size and ten feet long, the lower end resting upon a timber at the ground; to the top of the post was mitered and nailed the end of a beam of the same size which extended horizontally across the face of the verandah and a similar beam was also fastened at this point, extending horizontally back to the face of the building.

On the top of these beams were nailed boards which formed the floor of the verandah, and this floor entirely covered the post and beams at the point where the connections were made, so they could not be seen by one on that floor. The verandahs on each floor were constructed in the same manner. The three ten-foot posts were thus used to support this corner of three verandahs on the west side of the building, with the connecting beams, and also furnished the support for the northwest corner of the roof which projected from the entire north side of the building, to which gutters and drain-pipes were attached to carry off the water from the common roof, and were part of the

support for the whole verandah structure, including the stairways and landings used in common by all the tenants. Underneath the floor of the Rubino apartment, the ends of the beams and the top of the supporting post on which they were laid and fastened, had rotted and decayed, depriving the floor of Rubino's verandah of necessary support, thus causing the collapse. The photographs in evidence, taken afterward, show that the ends of the floor boards were clean-cut and apparently not decayed, while the ends of the beams and the top of the post at their connections under the floor, were largely rotted away.

The defendant had in its employ a caretaker who had general supervision of the external portions of the building, and who had shown all the vacant apartments in the building to the prospective tenant before he decided to lease the one in question. This caretaker occupied the apartment under that which Rubino finally took.

In addition to these conceded facts, the plaintiffs offered evidence to prove and claimed to have proved that it was the duty of this caretaker and other agents in the defendant's employ, to supervise the external portions of the building and keep them in repair; that they were well acquainted with the building, which was acquired by the defendant in 1931; that the building was old and had not been cared for for a long time by the former owner; that the decayed conditions referred to would have been apparent by inspection made in the caretaker's apartment; that these agents had visited the building several times before the day of the collapse and had made all of the repairs to the front verandah, walls, roof and other outside portions of the building; that after the collapse the defendant replaced the beams and supports in question with new ones, including new supports for the ground floor, and

new piers in the cellar; that the decayed conditions complained of had existed for at least four years and this portion of the building had not been painted for ten years; that the defendant and its agents had the privilege of access to all apartments for the purpose of inspection and making repairs and that it had made all inside and outside repairs during its ownership; that rainwater seeped into these connections beneath the floor of the Rubino verandah causing the decay, and that this was observable only from the apartment occupied by the defendant's agent; that Rubino was never given the opportunity of entering the apartment of this agent, and did not acquire this right with his lease, and was thus without means of knowing the condition. The defendant offered no evidence except three photographs as exhibits.

A vital feature of the case thus presented to the jury was whether the lessee or the landlord had assumed the risk of the defective condition of these beams and post. At common law, and save as modified by agreement or statute, the general rule is that a lessee takes the risk as to conditions in the leased premises; that he in effect purchases an estate in the premises leased, and it is ordinarily his duty to make such an examination of them as may be necessary to ascertain whether there are defective or dangerous conditions, and there is no warranty on the part of the landlord that the premises are safe or fit for habitation. In such cases the lessee takes exclusive possession of the premises and accepts them as they are, so far at least as obvious conditions are concerned. *Valin* v. *Jewell,* 88 Conn. 151, 156, 90 Atl. 36; *Rumberg* v. *Cutler,* 86 Conn. 8, 10, 84 Atl. 107; *Gallagher* v. *Button,* 73 Conn. 172, 175, 46 Atl. 819; *Lesser* v. *Kline,* 101 Conn. 740, 744, 127 Atl. 279; *Pignatario* v. *Meyers,*

100 Conn. 234, 237, 123 Atl. 263; *Chambers* v. *Lowe*, 117 Conn. 624, 628, 169 Atl. 912.

The court, in defining the relations of the parties, charged the jury in part as follows: "I shall . . . state in my own words what issues in these complaints are to be considered by you, and you should disregard all other issues. Merely to illustrate what I mean, there are more or less allegations in these complaints with reference to the injury having taken place in a part of this building retained by the landlord under his control, and that, therefore, a certain set of legal obligations ensue. That, for instance, I charge you directly is not in this case, and you will not hear me mention it again. And that is the kind of thing I say you should disregard in the complaints. . . . The general rule governing the relations of the parties such as those before you is as follows: In the ordinary contract of letting, the law does not imply any guarantee on the part of the landlord that the leased premises are in a safe and inhabitable condition, since the tenant ordinarily has it in his power to inspect the premises and so accepts the tenancy at his own risk . . . nor is there any implied agreement that he [the landlord] will keep in repair any part of the premises which are leased to and placed in the exclusive possession and control of the tenant. And I have already told you these premises for the purpose of these cases were in the exclusive control of the tenant. The general rule is, under such a contract, the lessee takes the risk as to the condition and quality of the hired premises and the landlord is not liable to the tenant for injuries sustained by reason of defective conditions of the building leased. . . . At first sight it would seem that if the defendant should have suspected the existence of the defect, the same would be true of the

tenant, and if that is your finding, as it may be, no recovery is possible."

In the absence of an agreement, expressed or implied, the tenant of an apartment acquires an exclusive right of occupancy and control of that apartment, and as incidental thereto of those parts of the structure which form an integral part of the tenement. 1 Underhill, Landlord & Tenant, § 272; 1 Tiffany, Landlord & Tenant, § 3. Thus in *Chambers* v. *Lowe, supra,* we held that a landlord is not liable for the fall of a ceiling within the apartment. See also *Dalton* v. *Gibson,* 192 Mass. 1, 77 N. E. 1035; 1 Tiffany, Op. Cit., p. 623. That might also be true of the floor of a verandah leased as a part of the tenement; but in the instant case the photographic evidence seems to establish that there was no defect in the floor boards which would have caused the collapse of the verandah. The reason for the rule with reference to ceilings does not apply to the structural parts of the building which are not a part of nor included within the apartment rented. The tenant has no exclusive control of these; for either the landlord or other tenants have the right of entry necessary for inspection and repair. There are varied and irreconcilable decisions in different jurisdictions as to the liability of the landlord for structural defects in an apartment house which are outside the particular tenement occupied by the party injured, but it is not necessary to consider them in the instant case. The plaintiffs offered evidence from which the jury could reasonably have found that the defendant had retained control of and assumed the duty of caring for the external portions of the building; that it had reserved the right of access, and that this right of control included the supporting timbers, the breaking of which caused the verandah to fall.

In *Chambers* v. *Lowe, supra,* at page 629, we pointed

out that the liability of the owner for injuries due to defects in passageways used by tenants in common, rests upon the fact that control of them resides in him. So where other portions of the apartment are under his control, it is his duty to use reasonable care to inspect and keep them in repair. *Killian* v. *Logan,* 115 Conn. 437, 440, 162 Atl. 30; *Hurlburt* v. *Sherman,* 116 Conn. 102, 105, 163 Atl. 603. This rule accords with the statutory requirement that "each building used as a tenement, lodging or boarding house and all parts thereof shall be kept in good repair;" General Statutes, § 2563; and in *Chambers* v. *Lowe, supra,* we construed this provision to apply to the building itself as distinguished from the separate apartments within it. The trial court was in error in removing from the consideration of the jury the question of fact as to whether the defendant landlord in this case had reserved control for the purpose of inspection and repair of that portion of this building which by reason of its defective condition caused this collapse and the resulting injuries. Evidence of repairs and replacements made by the defendant either before or after the collapse of the verandah, was admissible to prove that the control of that portion of the structure was with the landlord. *Vinci* v. *O'Neill,* 103 Conn. 647, 652, 131 Atl. 408, and cases cited. " 'When the defendant's liability depends upon whether a landlord or his tenant was in control of the premises, . . . the acts of control of such person are provable, and an act of repair done after the injury may chance to be such an act.' . . . The case should have been submitted to the jury on the issue of control." *Hunkins* v. *Amoskeag Mfg. Co.* (N. H.) 169 Atl. 3, 5, 6, and cases cited; *Readman* v. *Conway,* 126 Mass. 374.

We must sustain the appeal of the plaintiffs in this

regard, and this renders it unnecessary to consider other assignments of error.

There is error, and new trials are ordered.

In this opinion the other judges concurred.